Last case on the docket for this morning's setting is Carter v. SSC Odin. I've heard of that case before, I guess, huh? Yes, Your Honor. My name's Malcolm Parkins. Good morning. In view of the events that I observed this morning, I think I'm compelled to point out that my opponent has not waived oral arguments, but I'd sure like to get some of whatever it is that Mr. King has. He just scares them off, I guess. He's got the facts and the law on his side, you know. May it please the Court. The complaint in this case asserts two causes of action, a survivorship claim and a claim under the Wrongful Death Act. The trial court order that is on appeal here raises three issues that the Court needs to address. The first is, with respect to the application of the Federal Arbitration Act, the FAA, in the words of the Act, is there a contract evidencing a transaction involving commerce? In other words, the shorthand being the interstate commerce issue. If there is such a contract, then the FAA preempts the anti-waiver provisions of the Nursing Home Act. The second issue is whether or not the arbitration agreement is unenforceable because it lacks mutuality. And then with respect to the wrongful death claim, the question is whether the plaintiff can be compelled to arbitrate the claim, either because the decedent signed an arbitration agreement or because she herself, in her capacity as the legal representative of the decedent, signed an arbitration agreement. With respect to interstate commerce, the parties appear to be in general agreement that the two cases that should control the resolution here are the allied Bruce Terminex case and the Citizens Bank v. Alfabco case decided by the U.S. Supreme Court. We obviously disagree on the application of the principles that are discussed in those cases. Those cases set up two alternative approaches, pursuant to which a connection with interstate commerce sufficient to trigger the FAA can be found. Allied Bruce is a commerce in fact case. It looked at the transaction that was in question. It first held that the words involving commerce, as used in the FAA, are an indication that Congress was exercising its commerce plus power at its broadest reaches. It then went on and looked at the transaction and found that it was in fact in commerce because the pest control company operated in a multiple number of states. Secondly, that the supplies that were used to provide the pest control treatments came from a number of states. And thirdly, because supplies that were used to repair the house after there had been problems also came from out of state. If you look at the facts here, look at the arbitration agreement itself, for example, the agreement recites that the defendant is affiliated with a company that operates multi-state, 250 nursing facilities in a variety of different states, that it engages interstate commerce by entering into contracts for the management, for services, and for goods. In addition, in Ms. Gott's case, her care was covered by the Medicare program. The bills for her care were submitted to Mutual of Omaha in Omaha, Nebraska, based on the unrebutted affidavit of the administrator, and they were paid by Mutual of Omaha. And finally, the facility buys a vast number of supplies, everything from food, oxygen, the very beds that the residents rest in come from out of state. So we believe that the commerce in fact test is in fact satisfied here. With respect to the citizen's bank test, however, what the court did there is it reaffirmed the Allied Bruce test, but it said that's not the only way that you can find that the FAA is triggered because of a connection with interstate commerce. And in order to understand citizen's bank, it's important to understand what the Alabama Supreme Court had done initially. The case involved an agreement between an Alabama bank and an Alabama company to restructure certain loan transactions in Alabama. The Alabama Supreme Court looked exclusively at those loan transactions and concluded that because there was no evidence that the funds related to the transactions had moved in interstate commerce at any point with respect to those transactions, that those transactions themselves did not implicate interstate commerce. The U.S. Supreme Court began by reiterating the Allied Bruce holding that in the FAA, Congress was exercising its Commerce Clause power at its extreme ends. It then proceeded to say because the FAA is the exercise of the full reach of the Commerce Clause, it is, quote, perfectly clear, close quote, that the FAA applies to a wide range of transactions other than those that are actually in commerce. And the teaching of, I keep calling it alfabco, but the parties have called it citizen's bank in the brief, so I've been trying to use that, but I get tongue-tied every once in a while. But the teaching of the citizen's bank case is that the Commerce Clause power can be exercised without any showing of a specific effect on interstate commerce of the transaction, the economic activity that is at issue in a given case. Instead, if the economic activity viewed in the aggregate represents a general practice that would be subject to federal control, and that economic activity, that general practice has a substantial effect on interstate commerce, that is enough. And if you look, though we believe that both tests, both the commerce in fact test and the citizen's bank test are satisfied, but if you put aside the commerce in fact test and just look at the citizen's bank, I don't think there's any question that it is satisfied here. What the Supreme Court did in citizen's bank was it applied to both tests. It first found that because alfabco, the Alabama company, was engaged in commerce throughout the southeastern United States, that there was a connection with interstate commerce. And secondly, it pointed out that the debts at issue in the case, those loan restructuring transactions, were in fact secured by goods and assets that had been constructed with parts and materials that had been purchased out of state. But it then went on and it said, but if there's still any doubt about it, the general practice that's involved represents a transaction that's subject to federal regulation. That general practice was not the individual loans between alfabco and citizen's bank. The general practice was commercial lending. And the court said that there can't be any question about the impact that commercial lending has on the economy. So clearly, the interstate commerce connection is satisfied. In this instance, putting aside, again, the commerce in fact test and looking only at the citizen's bank test, there's no question that the economic activity that represents the general practice affects interstate commerce. In this case, it's not commercial lending. It's the delivery of long-term care services, which, as the court said, are to be viewed in the aggregate, not based on a specific transaction with an individual. I think that one of the problems that the trial court had here was that it focused exclusively on the transaction between the decedent, Ms. Goddard, and the nursing home. But that's not what the Supreme Court law says is the test that's to be applied. And to get some, I mean, I don't think it's really necessary to actually demonstrate the connection that the delivery of long-term care considered in the aggregate has on the economy any more than it was to demonstrate the impact of the commercial lending that was involved in the citizen's bank case. But if you look at this record, this one nursing home received $2.7 million in Medicare payments. Those bills were submitted to Mutual of Omaha in Nebraska, and they were paid by Mutual of Omaha on behalf of the Medicare program from Omaha, Nebraska. Those funds all moved in interstate commerce. And that's just one facility. That's not the aggregate inquiry that the court says should be pursued. In essence, what happens here in the trial court is that the trial court adopted the individual transaction must affect interstate commerce approach that the Alabama Supreme Court had used in citizen's bank. But by focusing on that, it got off the rails. And I think there are two cases that drive home the point that citizen's bank is trying to make. Both of the cases are cited in the citizen's bank opinion. One of the cases is Katzenbeck v. McClung, and the other case is Wickard v. Filburn. Wickard v. Filburn involved a wheat farmer. There was no evidence that the wheat farmer purchased wheat in interstate commerce or that he sold it in interstate commerce. What he did was he grew wheat for his own personal use. The court said that Congress had the power to regulate his production of wheat because taken in the aggregate with all others, it could have an impact on interstate commerce. In Katzenbeck v. McClung, Mr. McClung owned a barbecue, Ollie's Barbecue, in Birmingham, Alabama. It was several blocks away from an interstate highway. And the court looked at the amount of goods that Mr. McClung had purchased that had moved in interstate commerce. Approximately 46 percent of his meat, just the meat, had moved in interstate commerce. Just short of, actually, $70,000. And the court found that that was sufficient in order to establish the connection with interstate commerce. Counsel, I don't want to cut you off too much with your argument there, but I do want you to address the other two issues that you pointed out, the mutuality and also the wrongful death bill. Okay. I mean, those are also issues that we have to decide. Okay. Thank you, Your Honor. I'll jump ahead to those issues. And I don't mean by doing that that that somehow affects anybody's argument with regard to the commerce issue. Thank you, Your Honor. I think any lawyer standing in front of the court would rather talk about what the court needs to hear about than what he wants to hear. I want to hear, and I know all of us want to hear about all three issues. Okay. Thank you. The argument on lack of mutuality is that there is no reciprocal promise to arbitrate. It's based on the assertion that the facility's promise to arbitrate is illusory because there is a $200,000, lack of a better term, amount in controversy requirement before the obligation to arbitrate is triggered. That argument assumes its conclusion because what it does is it ignores the fact that the arbitration agreement itself provides for other consideration. I mean, put aside the promise to arbitrate entirely for the moment. The arbitration agreement itself provides that the facility will pay the fees, all of the fees of the arbitrators, that it will pay up to $5,000 of attorney's fees, win or lose, that are incurred by the plaintiff. It provides that the plaintiff gets to pick the site for the arbitration, and it gave the plaintiff and her legal representative a unilateral 30-day right to rescind. That consideration alone is sufficient to establish mutuality. That is consistent with this Court's recent decision in Keith, which made the point that the promises don't have to be equal. There has to be an obligation that is imposed on both parties such that the parties have reciprocal obligations one to the other. Then secondly, if we look at the promise to arbitrate, the arbitration agreement itself lays out, when it describes what it covers, it lays out a number of causes of action that the facility might have that could exceed the threshold. And we've identified some of them in our brief. They could be things like defamation. It could be fraud. It could be fraud in the inducement. It could be negligence. One of the things that we attached to our brief was a recent news article where a nursing home resident in Chicago, with careless smoking, set his room on fire, killed his roommate, and caused injury to several other residents in the facility. Certainly you can find some scenario or spin a scenario where the nursing home would sue the resident for more than $200,000. Yes. Is it reasonably likely in most circumstances that the nursing home would ever have a claim against a resident for more than $200,000? It doesn't happen that often, Your Honor. To be honest, I look to try to find cases, and I also talk to a number of our clients, not just this client, about it. And one of the answers that I got back was that we don't sue our customers. And they said that the other reason may be that a lot of those claims get resolved before there's ever litigation that is brought or thought about because the nursing home has so much at stake from a business reputation standpoint. All right. Now, to be mutually binding on this agreement to arbitrate, wouldn't it have to bind both sides to arbitrate their claims? And in other words, what I'm saying there is just because one side agrees to pay for the arbitration, does that give consideration to justify mutuality if that side is never going to have to arbitrate claims that they bring or not likely to? Your Honor, I think that it is possible for parties to enter into an agreement that requires one of the parties to arbitrate but not the other. As long as there is sufficient consideration going back and forth. And that's why I started off by saying let's just put the promise to arbitrate aside. Assume for the sake of the discussion at the moment that it is illusory or that it's not even in the agreement for that matter. We still have the consideration, and the arbitration agreement itself acknowledges that there's good and sufficient consideration. But that consideration, those payments that are being made, are obligations of the facility. And to go beyond that gets us into a situation where we're weighing the value of the consideration. And I don't think that that's the province of the court. Those promises are real. They impose significant obligations on the facility. And whether the promise to arbitrate is illusory or not, I think, is really beside the point. Secondly, the suggestion in this case that the promise is illusory is not supported by any evidence. It's pure speculation. And that's not something that ought to be a basis for a decision that says, well, the rule is that if one side promises to arbitrate, the other side has to provide an equal promise to arbitrate in any and all circumstances. Or how about a reasonable promise to arbitrate, one that's reasonably likely to actually bind the other party? But I don't think that the consideration has to be a promise to arbitrate. I could, if you and I were to enter into a contract, I could say you were buying widgets from me, and we entered into a contract. I could say, if you have a problem I want you to arbitrate, but I'm not willing to, here's $10,000. You could look at that and say, well, that's good enough for me. I don't think I'm ever going to get there, but that's good enough for me, even though I haven't promised to arbitrate a single thing. I think in that situation, you have mutuality. If you move beyond that and say, well, there has to be more than the payment of the fees of the arbitrator and the attorney's fees and the other consideration, then you're getting into a weighing of the consideration and saying that the rule is that if one side promises to arbitrate, the other has to realistically promise to arbitrate. Are you saying that any consideration would show mutuality? Any? No, I'm not going that far. I'm saying that the consideration that is provided in this agreement shows mutuality because it is significant. We're talking about paying the fees of the arbitrator, whatever they may be. So in your example, if you gave Judge Stewart $10 instead of $10,000, that may not be sufficient consideration? That might raise a question, Your Honor. A lack of mutuality? It might raise a question, but I think that you have to look at the agreement in context and at the whole agreement. And that's clearly not the situation here. $5,000 in attorney's fees, win or lose, is not $10. The payment of the fees of the arbitrator is not $10. Those numbers are significant. We can argue about whether I would have wanted more or you might have wanted more, but that's a value judgment. It is consideration. Well, from a standpoint of mutuality, couldn't it be looked at as basically you're saying, you know, we want to arbitrate your claims so bad that we'll pay this money, but we want this agreement to be such that we never have to arbitrate our claims. And you're saying that would be supported by valid consideration and mutuality. Excuse me. I'm sorry. I didn't mean to step on you there. No, no. I think even if there was no promise to arbitrate, it would be. I think that's what the Keith decision says. It's that there doesn't have to be equivalency. There has to be an obligation imposed on both parties so that they are reciprocal. I'm not going to get that. They both owe one another something and that it can be enforced and it's real. And that is the case under this agreement. With respect to the wrongful death claim, and I see the lights flashing, so I probably won't get through it all. But the point is. You'll have time to read that. Thank you. There are two reasons why arbitration should be required of the wrongful death claim. The first is the nature of the wrongful death claim. And the second is that based on the terms of the arbitration agreements. As you know, the Illinois Supreme Court has held on multiple occasions that the existence of a wrongful death claim depends upon whether the decedent at the time of his or her death had the right to maintain an action. And unlike the situation in some states, in Illinois, because the wrongful death claim is conditioned on the decedent's right to maintain an action, the Supreme Court has also said on multiple occasions that the claim is derivative. And I'm not, although there are cases from other states that talk about, like the Labatt case that we cited in our brief from Texas, that talk about what it means when a claim is derivative. I'm not aware of any Illinois case that addresses the precise issue in front of us now. But the court. Finish your thought, Hans. But the Illinois Supreme Court has decided what it means to say that a claim is derivative in other contexts. In the sense that the claim must be based on the same injury, that it's the same cause of action. And recently in the Williams case, the way they described it was to say that when the decedent dies, the claim is transferred to the wrongful death claim. In other words, it moves over. It makes no sense to say that something is transferred or that it is derivative if what happens is that in the hands of the person who receives it, it's different. Thank you, Your Honor. Thank you. Good morning. Good morning. May it please the Court, I'm Stacey Amble, representing the appellee in this case. With regard to the question of whether or not there are, that the contract involved in question here evidences a transaction involving interstate commerce sufficient to trigger the FAA. Counsel, I believe, indicated that there were two primary cases that are relevant, the Allied Bruce case and the Citizens Bank case, and we would certainly agree with that. However, we would disagree with counsel's characterization of the relationship of those two decisions. I believe counsel indicated that those cases set forth two alternative approaches. But in fact, Your Honors, if you would look at the Allied Bruce case and the Citizens Bank case, that's certainly not the case. The Allied Bruce case was the case in which the United States Supreme Court denunciated the involving commerce test. When the United States Supreme Court indicated that that term involving commerce is likened to the term affecting commerce and, in fact, indicated that it had broad application. The Citizens Bank test did not provide, the Citizens Bank case did not provide for a separate involving commerce test, but rather clarified the involving commerce test that was enunciated in Allied Bruce. And basically, in Citizens Bank, the Supreme Court, while it acknowledged that the scope of the involving commerce or what could trigger the involving commerce principle was broad, it indicated that that was not without limitation. In fact, it said in the Citizens Bank case, to be sure, the power to regulate commerce, though broad, indeed has limits. And the court clarified those limits in the Citizens Bank decision. And specifically what the court held, and I'm quoting, it held that Congress's commerce clause power may be exercised in individual cases without showing any specific effect on interstate commerce. And this is the key language. If, in the aggregate, the economic activity in question would represent a general practice subject to federal control. The court went on to say, only the general practice need bear on interstate commerce in a substantial way. For its ruling in the Citizens Bank case, the United States Supreme Court applied that principle that I just quoted. And it specifically looked at the nature of the transactions between the parties to the case, the impact of those transactions on interstate commerce, and the general practice that it represented. And it found, specifically with respect to the transactions between the parties to that case, that commercial lending as a general practice had a broad impact on interstate commerce. And Congress's power to regulate the activity pursuant to the commerce clause. And therefore, it found that the debt restructuring agreements were contracts that evidenced transactions involving interstate commerce, and that the arbitration clause was enforceable. In this case, the circuit court appropriately applied the Allied Bruce test that was, again, set forth in Citizens Bank. And like the court in Citizens Bank, it looked at the transactions between the parties and the impact of those transactions on interstate commerce and the general practice that those transactions represent. In the court's ruling, it noted that the underlying contractual relationship between the resident and the nursing home was for the provision of personal care in Marion County. The court found, and the court looked at all the factors that have been co-offered by the defendant, including the affidavit of their business manager where she talked about the receipt of Medicare payments and the fact that they get food and other products from out of state. And even looking at that, the court found that in the aggregate, the economic activity involved in the provision of personal care and skilled nursing services does not represent a general practice subject to federal control, and that the general practice of providing personal nursing home care does not bear for interstate commerce in a substantial way under the analysis set forth in Citizens Bank. And so the court appropriately applied the Supreme Court precedent in Citizens Bank. The same approach was made by the Oklahoma Supreme Court, and we've cited to it in our brief, in the Bruner v. Timberland Manor Limited Partnership. And actually, the facts were much the same as in this case. There was an affidavit by the business manager talking about Medicaid payments and the use of products from out of state. The court looked at those factors and found that basically the nursing home admission contract involved a profoundly local transaction in state nursing home care, and that the evidence of the interstate commerce in that case demonstrated a de minimis impact on interstate commerce, not a sufficient enough impact to trigger the FAA. It found with respect to the Medicare payments that Congress had not declared that the Medicare and Medicaid program to be economic activity, the general practice of which may be regulated under the Congress clause. And as was the case in Citizens Bank, as was the case with this circuit court, in applying the Citizens Bank analysis, the Oklahoma Supreme Court found that there were not sufficient contacts in interstate commerce to trigger the FAA. We believe that that's the case here and that the circuit court appropriately decided that. Now, the issue of the MIFWA, there can be no doubt of what the intent was when you look at that agreement. The nursing home set a ceiling to trigger arbitration that basically said, resident, you will agree to arbitrate any claim that you may have against us over $200,000. And basically, the parties will agree to arbitrate that. And counsel has argued that there is sufficient consideration for the promise to arbitrate by Ms. Scott and that, in fact, there is a mutuality. However, I believe counsel said in response to Your Honor, whether or not the promise is illusory is beside the point. Well, it's not beside the point. In this state and specifically under the, and I know I'm going to butcher this word, Vasilkova v. Woodfield-Nissan case, the first district pointed out in that case that all those obligations don't have to be identical, where the agreement to arbitrate is itself a separate document, which is what we have in this case, purported to bind each party to the arbitration agreement, but subsequently creates a total exclusion of one party's obligation to arbitrate. The obligation is illusory and unenforced. And just in that case, just as was true in that case, when the — Now, that case focuses on a mutual obligation to be bound to arbitrate. Yes, exactly. And in that case, one of the parties, the dealership, while it said that we agreed to arbitrate, it carved out all of these exceptions to the claims that they would arbitrate so that when you got down to the end, there was no claim that realistically would exist between them and the buyers that would require them to arbitrate. And that's what's happening in this case. You know, the fact that there was some news article where some resident was smoking and did damage does not remedy the fact that realistically, when you look at the relationship between these parties and the claims, the potential claims that each party could have, there is no realistic or meaningful claim that the defendant could bring or could have against a resident misguided. That would take them above the $200,000 ceiling. And so clearly the intent was is to get the residents, such as Ms. Gott, to agree to arbitrate claims and to have it look like a mutual agreement to arbitrate when there is none at all. Well, then really you're only arbitrating serious injury or death claims. Exactly right. The Housing Council claims that there does not have to be mutual agreements to arbitrate in order to defeat the defense of no mutuality in the agreement itself. Do you want to comment on that? Sure. Under the Vassipova case, when the parties, when the agreement purports to provide for mutual agreements to arbitrate, but in reality is one-sided and one party's agreement to arbitrate is illusory, then it's unenforceable. If they would have agreed to pay $50,000 for arbitration expenses directly to the patient, would that be lack of mutuality? I would think so because it's a little... Let's say they agreed to pay $100,000. I mean, there has to be some point in time where there would be, even though there's not the same practical ability to arbitrate on both sides, that there would be enough consideration. Well, I think the difference is, Your Honor, and the key is here, the promises that were purportedly made in this agreement was a purported mutual promise to arbitrate. It wasn't if you arbitrate, we will agree to pay X. It was the parties both mutually agreed to arbitrate. But the parties don't agree to pay each other $5,000 for expenses. I'm sorry? The parties don't agree to pay each other $5,000 for expenses. That's just on one side. But the parties supposedly... What the nursing home agreed with Ms. Gott was that we will mutually agree to arbitrate claims. And that's not the case. That's not the case. And then they go ahead to carve out this exception where, in fact, that's what lacks the mutuality. In the Vassilkova case, I think there was other agreements that were examined by the court. But the truth was, and what it came down to was, if you still say that you're going to agree to a mutual obligation to arbitrate your claim, but then you carve out all the exceptions so that it's just illusory. There's nothing meaningful. Okay. And if the nursing home says, you have to arbitrate all of your claims, could that ever be enforceable? It depends on what the consideration was. So aren't we back to that, if they give you $50,000 or $100,000 or $5,000, we have to determine is that sufficient consideration? Isn't that the issue? Well, I think the issue is, yeah, the issue is whether an illusory promise is sufficient consideration. And I think the court has held that the answer to that is yes. But in that case, was there any other consideration other than a promise for a promise? Actually, I think there was, Your Honor, but I don't remember the specifics, so I can't make that representation. Your argument is that the agreement to pay $5,000 to defray costs and also to pay the cost of the arbitrator is insufficient consideration, which then leads to the fact that the contract is illusory. My argument is that the agreement to mutually arbitrate the claim under the circumstances is insufficient consideration and it cannot be made sufficient by an agreement to pay $5,000. But it could be if it was presumably $10,000 or $100,000 or something else. I don't necessarily agree with that because I don't think you can ignore You can never have sufficient consideration unless both sides agree to arbitrate the exact same What? No, Your Honor, I don't believe that. Okay. And so for that reason, I think under strict general contract principles applicable in this state, that makes this contract unenforceable. I now want to move to the wrongful death claim because I think that, again, that's an issue here. First of all, the defendant keeps referring to two contracts. As we pointed out in our briefing, Ms. Gott executed a 2005 contract on a previous admission. She was admitted. She was discharged. She went back home. She was readmitted to the nursing home in 2006. She executed a separate, a different admissions contract with the arbitration provisions in it, with a separate arbitration agreement. She was the only signatory to that contract along with the nursing home facility. Under the II case and the contract law in this state, because they dealt with the exact same issues, the 2005 agreement, once the 2006 agreement was executed, was merged into and superseded by the 2006 agreement. So the only real arbitration agreement under consideration here is the 2006 agreement, which was not signed by the plaintiff, suit parter, or any of the wrongful death beneficiaries. Well, if the earlier agreement would have covered this new admission, there wouldn't have been any need to execute another contract, would there? Exactly right. Exactly right. Although I think there's some language in the agreement itself that says basically this agreement shall remain in the force and effect no matter what, if you execute subsequent agreements. But under the clear contract law, that is not the case. So now we're dealing with an agreement that was executed by the nursing home, and Joyce got the deceit. So the question is, can Sue Carter be bound to a contract that she was not a party to? This court recently answered that specific question when we believe in the Trove case, where you said, it is well settled in Illinois that a non-party to an arbitration agreement can neither be compelled to arbitrate or compel arbitration. Nevertheless, the defendant argues that pursuant to Supreme Court decisions interpreting the Illinois Wrongful Death Act, the plaintiff here is bound by the arbitration agreement between Ms. Scott and the nursing home, and specifically they refer to the Varela's decision and the Williams decision. And while it is true that the Supreme Court in this state has clearly held that a wrongful death claim is derivative of the deceitous right to pursue an action for personal injuries at the time of death, the court has not expanded the Wrongful Death Act beyond requiring that the deceit have a viable underlying personal injury claim at the time of death. Specifically, counsel and the defendant look at the word derivative, and what they are urging this court to do is to take that word and to define derivative under these circumstances in a broad and expansive way that is not supported by the law in this state. The language used originally by the Supreme Court in the Varela's decision basically said, thus in a variety of contexts, our court has referred to the rule that a wrongful death action is barred if the decedent at the time of death would not have been able to pursue an action for injuries. Then they say, importantly, in this sense, an action under the Wrongful Death Act may be said to be derivative of the decedent's right, for the ability to bring the wrongful death action depends upon the condition that the deceased at the time of his death, had he continued to live, would have had a right to action. So the wrongful death claim is derivative only in the sense and to the extent that the decedent at the time of death must have had a right to pursue a personal injury action. It's only derivative of a viable personal injury action. You cite two cases, one the Missouri case, the Finney, and then the Bybee or Beebe case in Utah. Yes. Do you know, counsel, whether or not their wrongful death statutes barely mirror Illinois' wrongful death statutes? I do know for a fact that the Missouri wrongful death statute barely mirrors it. There may be some different words, but it provides for the same thing, that in order for the claim to go, there must have been a viable personal injury claim by the decedent for injuries at the time of death. Presumably Utah does the same? Utah, actually, I don't believe so. I'm not sure that their wrongful death statute is the same, but basically the Utah case, what it goes into and what it talks about is the extent of derivative, what that means. And it talks about that it goes to the viability of the underlying claim. In other words, what the defendant is arguing here is that basically the wrongful death claim is derivative of a contract. That's not where the derivative goes to. It's not derivative of Ms. Gott's contract. It's derivative of her right to pursue a cause of action for her injuries at the time of death, which she clearly had. That does not then mean that Ms. Carter and the other wrongful death beneficiaries totally step into Ms. Gott's shoes and have to accept any and all contractual limitations that she may have agreed to. That is not what the court in this state has held. But that's the expansion that the defendant is urging on this court. And basically what it would then go to is, you know, Ferraris and Williams do not stand for the proposition urged by the defendant on this court that a wrongful death action is subject to any and all contractual limitations accepted and agreed to by the decedent. A wrongful death action is only subject to the substantive defense, which would defeat the viability, for instance, a release of claims, or if the decedent had already had her day in court. The derivative nature of a wrongful death claim, as interpreted by the Borales Court, does not require this court to set aside ordinary contract principles, including privilege, and to therefore bind Ms. Carter to an agreement that she is not a party to. Thank you, Counsel. Any rebuttal? Your Honor, I'd like to more or less pick up where I left off. But first I want to clear up one thing in response to the question you asked about the comparability of the Missouri and the Utah statutes to Illinois statute. In fact, they are not the same. In Missouri, first of all, the courts have held that the right is not derivative of the decedent's right. That is an enormous distinction between Illinois and Missouri. Secondly, by its terms, the Missouri statute depends on the decedent's right to obtain damages, not on whether or not he could have maintained an action on his death. With respect to Utah, the Utah wrongful death language derives from the state's constitution. And the court has held that rather than being prescribed and strictly applied, that it occupies a position of privilege among courts in the state. And what the Utah statute says is that a cause of action arising out of personal injury to a person or death caused by the wrongful act or negligence of another does not abate upon the death of the wrongdoer or the injured person. It's nothing like the Illinois statute whatsoever. And I think the key here is what does it mean when the court says that the wrongful death claim is derivative? What does it mean when the Williams court said it's transferred from the decedent to the claimant? The Texas Supreme Court recently addressed the question. One of the points the Texas court made is that whether or not a wrongful death claimant is bound to arbitrate. Now, we're talking here about a non-signatory to the arbitration agreement. But whether they're bound to arbitrate or not shakes out along the lines of whether the state holds that the wrongful death claim is derivative or not. If it is derivative, they are bound to arbitrate because the very nature of deriving something, of something being transferred to you, you get it as it was. It doesn't change its character because it's now in my hands rather than in the decedent's hands. Whereas in courts that hold that the wrongful death claim is not derivative, those courts do not bind non-signatories to the agreements to arbitrate. And I think that when we look at this situation, we have a saying that the wrongful death claimant here is not bound to arbitrate. It creates significant problems. For example, a plaintiff conceives that there are some contractual limitations that the decedent can enter into during his lifetime that would preclude a wrongful death claim from being brought. The Verrilli's case is one of those examples. There was a settlement that wiped out the claim. But the argument that they make is that contracts that affect procedural rights involving the wrongful death claim, those do not transfer with the claim. Now, that argument cannot be reconciled with the derivative nature of the claim. It ignores the decedent's right to contract away not just his property in its entirety but aspects of his property. It produces an anomalous result that he can eliminate the entire claim, but he can't address aspects of the claim. And the other problem, of course, is as the Texas Supreme Court held in the Labatt case, that if you draw a distinction that's based upon whether or not something has to be arbitrated, you're jumping right back into the FAA problem. You're creating something that is specific to the arbitration remedy. I think ultimately, if the claim is derivative, that means that the claimant gets it in the form that the decedent had it. Now, with respect to the argument about the agreement being merged, there are problems with that. I think that there are a couple of basic reasons why that isn't correct. The first is the arbitration agreement on its face specifically says that it remains valid if the resident is discharged and readmitted for later stays. So it says on its face that it continues in effect. The second is that the first arbitration agreement applies to two states, the original 2005 state and the 2006 state, unlike the 2006 arbitration agreement. The second is that the agreements were executed by a third, is that they were executed by different individuals. In 2005, plaintiff Ms. Carter, in her capacity as Ms. Scott's legal representative, executed the agreement, whereas in 2006 only Ms. Scott executed it. And the blank for the legal representative is not completed. And finally, the agreement expressly provides that it is an agreement to arbitrate disputes between Joyce Scott, parenthesis, the resident, and or Sue Carter, parenthesis, legal representative, and the facility. Thank you, counsel. Thank you very much for your arguments and your briefs. I guess this is not going to be settled, so we're going to visit it again and maybe our spring quarter visit again. But thank you all very much. We'll take the matter under advisement and get back with you in due course.